IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**REGINALD ALAN DAVIS**                                                                                           **PLAINTIFF**

**v.**                                                                                 **CIVIL NO.: 3:23-cv-00163-MPM-RP**
                                                                                                    **3:23-cv-00360-MPM-RP**

**SIEMENS INDUSTRY INC.**                                                                    **DEFENDANT**

**ORDER**

This cause comes before the court on the motion of defendant Siemens Industry, Inc. for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff Reginald Alan Davis has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, is prepared to rule.

This is a retaliation and disability discrimination action arising out of mistreatment which, plaintiff alleges, he suffered at the hands of a Siemens supervisor. Plaintiff served with the U.S. Marine Corps, and he suffers from post-traumatic stress disorder ("PTSD") as a result of his having served in combat. Siemens has employed Davis at its Southaven facility since 2019, when he was hired as a Senior Lead of Training. [Davis Depo. at 34-36]. In August 2020, Davis accepted a position as a Zero Harm Culture Champion reporting to Environmental Health and Safety Manager Joseph Lampkins, and he has worked in this position at all times relevant to this action. [Davis Depo. pp. 38-40.]

In February 2021, Davis was interviewed as part of an internal investigation into a sexual harassment complaint brought by a female employee, Tequila McKinney, against Lampkins. *See* Exhibit F. Plaintiff asserts that he offered truthful testimony that he had witnessed Lampkins

inappropriately touching McKinney, and that, almost immediately after doing so, Lampkins began a lengthy campaign of retaliation against him which involved, among other things, greatly increasing his work duties. Plaintiff seeks recovery under Title VII as a result of this alleged retaliation, and he also seeks recovery under the Americans With Disabilities Act (ADA), based on, *inter alia*, defendant's failure to offer reasonable accommodations for his PTSD. Defendant has presently moved for summary judgment, arguing that no genuine issue of fact exists regarding its liability under either statute and that it is entitled to judgment as a matter of law.

In addressing the summary judgment issues in this case, this court will begin with plaintiff's retaliation claim, since the legal issues in this context seem relatively clear. A Title VII retaliation claim based on circumstantial evidence is analyzed under the *McDonnell Douglas* burden-shifting framework. *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 1000 (5th Cir. 2020). Under that framework, the plaintiff "carries the initial burden of establishing a prima facie case of retaliation." *Id.* (quoting *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003)). To establish a prima facie retaliation claim, "a plaintiff must show that '(1) he engaged in conduct protected by Title VII; (2) he suffered a materially adverse action; and (3) a causal connection exists between the protected activity and the adverse action.'" *Cabral v. Brennan*, 853 F.3d 763, 766–67 (5th Cir. 2017) (quoting *Jenkins v. City of San Antonio Fire Dep't*, 784 F.3d 263, 269 (5th Cir. 2015)).

"If the plaintiff establishes a prima facie case, then the employer has the burden of production to provide 'a legitimate, non-[retaliatory] reason' for the adverse employment action." *Id.* (quoting *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020)). "If the employer meets this burden, then the plaintiff has the burden to prove that the proffered reason is pretextual." *Id.* (quoting *Brown*, 969 F.3d at 577). This court notes that protected

activity under Title VII's anti-retaliation provision "can consist of either: (1) 'oppos[ing] any practice made an unlawful employment practice by this subchapter' or (2) 'mak[ing] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under this subchapter.' " *E.E.O.C. v. Rite Way Serv., Inc.*, 819 F.3d 235, 239 (5th Cir. 2016) (quoting 42 U.S.C. § 2000e-3(a)). The first is known as the "opposition clause," and the second is known as the "participation clause." *Id.*

It seems clear that this case involves an "opposition" retaliation case, since, in his complaint and summary judgment submissions, plaintiff makes what this court regards as quite plausible allegations that he suffered retaliation at the hands of Lampkins after he testified that he had witnessed him committing acts of sexual harassment. For example, plaintiff alleges that, while Lampkins had previously treated him as his "golden boy," he began treating him in a "sarcastic and condescending" manner and began altering his workplace conditions. [Affidavit at 2]. More specifically, plaintiff alleges in his brief that:

> 6. On March 8, 2021, unknown to Plaintiff, Joseph Lampkins began closely scrutinizing the Plaintiff's work. Ex. 8, Lampkins Secret document.
> 7. Joseph Lampkins called it the "Reggie Log," and he testified that Plaintiff was his only employee documented in this way. Ex. 4, Lampkins Dep. 56:19-57:13; 60:6-8. * * *
> 9. Lampkins assigned Plaintiff parking lot duties, where Lampkins gave Plaintiff the responsibility to ensure that employees were parking properly. Plaintiff performed this function every day for 1.5 hours. James Calhoun later testified that the parking lot duty assigned to Plaintiff was not a job function at Siemens. Ex. 3, Calhoun Dep. 66:6-20; Ex. 1, Davis Aff. § 17.
> 10. Lampkins continued to escalate Plaintiff's workload while denying him the ability to work overtime to keep up with the increased duties. Davis Aff. §§ 10, 11, Ex. 8, ―Lampkins' Reggie log.‖
> 11. From August 2021 through 2022, Lampkins assigned Plaintiff to locate a missing J-hook. The project proved a wild goose chase because Lampkins rejected all finished products for trivial reasons, such as the color wasn't right, the size was stamped on the left side rather than the right, and the eye bolt wasn't large enough. The motors department accepted the hook as perfect, but Lampkins rejected it. Davis Aff. § 15,
> 12. In September 2021, Lampkins increased Plaintiff's job duties to include cleaning the facility, dusting, rearranging pallets, and garbage pickup. Davis Aff. § 13, Amended Comp. D.E. 7, PageID #28, ¶ 25.

>13. In October 2021, James Calhoun took a 6-month leave of absence for shoulder surgery. In his absence, the Plaintiff performed his duties and Calhoun's duties. When the Plaintiff returned after a 6-month mental health leave on March 8, 2023, Lampkins, in addition to the Plaintiff's regular duties, gave him a Task list with imminent due dates. Ex. 9, Reggie Davis Task List.
>14. James Calhoun testified that when he returned from his 6-month leave, Lampkins only required him to watch videos with no specific completion date. Lampkins assigned Plaintiff duties that were not true functions of the safety team. Ex. 3, Calhoun Dep. 30:9-19; 55:21-57:2; Ex. 9, Reggie Davis Task List ¶ 6.
>15. In November 2021, the Plaintiff spoke to Human Resources about his increased workload. In addition to his regular duties, Lampkins required him to conduct off-site recruiting through job fairs, conduct COVID-19 testing, and complete all the training for every shift. Davis Aff. § 11.
>16. In early 2022, Lampkins assigned Plaintiff the new hire orientation without decreasing existing duties. Lampkins imposed additional duties and deadlines on Plaintiff. Plaintiff was told, through written counseling, that unless improvement was immediate, marked, and sustained, he was subject to termination. Exh. 10, Written Counseling from J. Lampkins, Ex. 4, Lampkins Dep. 35:23-36-2.
>17. In March 2022, Lampkins appointed Plaintiff to spearhead an emissions reduction program called "Degree." Plaintiff was the only non-management employee assigned to this program. Plaintiff had no training concerning the program, and at the first meeting, before a room full of executives, Lampkins turned to Plaintiff and said, "Okay, Reggie, why are we here?" The ambush was intended and did publicly embarrass the Plaintiff. Ex. 3, Calhoun Dep. 77:14-78:4; Ex. 4, Lampkins Dep. 35:4-37:15, DE 7, Amended Comp. PageID 28-29, ¶¶ 26-28.
>18. On August 18, 2022, Lampkins gave Plaintiff a written reprimand for violating the Code of Business Conduct. Plaintiff vehemently denied the statement. Exh. 11, written reprimand; Davis Aff. § 20.

[Brief at 3-5].

Plaintiff maintains that, on August 18, 2022, Lampkins tacitly conceded that he was retaliating against him, asserting in his affidavit that:

>In my frustration and in tears, I asked him "why are you doing me like this?" I told him "you're trying to trigger my PTSD." He said "you know why." We began to talk loudly. Marlon Richards came and closed the door. HR diffused the situation and placed us both on a 30-day cooling-off period.

[Affidavit at 4-5]. In his affidavit, plaintiff asserts that Lampkins' retaliation became so unbearable that he was forced to seek medical treatment, writing that:

>After completing the cooling-off period, Lampkins demanded that the volunteer Safety Team assume responsibilities outside their job description. I knew the added work would

4

> cause them to quit. Lampkins threatened to disband the team that I had labored to construct. My stress level became unbearable. I went to Baptist Desoto Hospital for dizziness and feelings of oncoming PTSD. My blood pressure was elevated to stroke levels. I re-engaged the VA's PTSD treatment program for assistance.

[*Id.* at 5].

This court regards these as quite powerful allegations of retaliation, but defendant notes that plaintiff faces a significant obstacle in seeking to recover for them. Specifically, defendant notes that a plaintiff seeking to recover under either the ADA or Title VII is required to file a charge of discrimination with the Equal Employment Opportunity Commission within 180 days of the alleged adverse action. *See Dao v. Auchan Hypermarket*, 96 F.3d 787, 789 (5th Cir. 1996) (per curiam) (noting that the ADA incorporates by reference Title VII's administrative procedures). The 180-day period acts as a statute of limitations, barring any actions seeking recovery for events which fall outside of the 180-day period. *Hood v. Sears Roebuck & Co.*, 168 F.3d 231, 232 (5th Cir. 1999) (*citing Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982)).

It seems clear that the 180-day limitations period is an even greater obstacle to plaintiff's retaliation claim than to his ADA claim, since he filed two separate charges with the EEOC and only raised his retaliation claim in the second charge. In light of this fact, defendant argues that:

> As with his ADA claim, a claim of retaliation under Title VII requires a plaintiff to first exhaust his administrative remedies by filing a charge of discrimination with the EEOC within 180 days of the alleged adverse employment action. As explained below, no alleged adverse action occurring **prior to November 12, 2022** or **after June 20, 2023** would be timely for purposes of Davis's Title VII retaliation claim.
> Davis filed his second charge of discrimination – and the only charge alleging Title VII retaliation – on May 11, 2023. Therefore, no alleged adverse actions occurring more than 180 days before this date, or November 12, 2022, can support Davis's Title VII retaliation claim. The EEOC dismissed Davis's charge on June 20, 2023. Therefore, no alleged adverse actions occurring after that date can support Davis's retaliation claim.

5

[Brief at 11]. In his responsive brief, plaintiff does not take serious issue with defendant's description of the applicable limitations period in this case, nor does he offer this court any basis for tolling the statute of limitations.

In light of the foregoing, this court might well be compelled to dismiss plaintiff's retaliation claim as untimely if he had failed to properly allege an act of "materially adverse" retaliation which he suffered during the November 12, 2022 to June 20, 2023 time period. Fortunately for plaintiff, however, that is not the case. In its brief, defendant concedes that plaintiff does offer at least one allegation of retaliation which falls within the actionable time period, writing that:

> Davis claims only one alleged adverse action which falls within the time period actionable for his Title VII retaliation claim. Specifically, Davis claims that when he returned to work on March 8, 2023, Lampkins presented him with a "to do" list, which contained numerous items with due dates, some of which had already expired. Amended Complaint, ¶35. This is insufficient to support Davis's claim. In the retaliation context, an adverse action must be "materially adverse" meaning that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826 (5th Cir. 2019) (quoting *BNSF Co. v. White*, 548 U.S. 53, 67–68 (2006)). For example, "[a] reassignment that requires additional tasks is not materially adverse if it is not accompanied by any other change in the employee's status." *Paul v. Elayn Hunt Corr. Ctr.*, 666 F. App'x 342, 347 (5th Cir. 2016).

[Brief at 11-12].

In the court's view, defendant's assertion that plaintiff was merely "presented with a 'to do' list" is a gross understatement of what he alleges took place after he returned from medical leave. Indeed, plaintiff testified in his deposition that Lampkins essentially picked up where he had left off before his medical leave, namely by imposing requirements upon him which were not placed upon other employees and, in the case of the "to do" list, included tasks which he was simply unable to perform. [Deposition at 155]. This court notes that the "to do" list was not a list of minor tasks which could be quickly completed, but, rather, included difficult tasks which,

6

for the first time in plaintiff's experience at Siemens, were accompanied by due dates when they had to be completed. [*Id.*] Plaintiff testified that Lampkins warned him that, if the due dates were not met, he would face unspecified "consequences." [*Id.*]

Most compellingly, in this court's view, plaintiff alleges that the "to do" list included items which required him to use a computer to which he lacked access and which he accordingly could not perform within the stated deadline. [*Id.* at 156]. Indeed, plaintiff testified that he told Lampkins that "the ones that required me to use a computer, you know good and damn well I'm not going to meet that deadline." [*Id.*] In his deposition, plaintiff testified that the fact that he had been given the assignment sheet by Lampkins was quickly picked up on the company rumor mill, and he asserts that he received sympathetic remarks from co-workers expressing their belief that his supervisor was attempting to manufacture a basis to fire him. For example, plaintiff testified that one co-worker asked him about the assignment sheet, and, when asked how he knew about it, replied:

> Darrell told me. How does he know about that? He found out from, you know, the front office that Jospeh [Lampkins] gave you some bullshit, you know, assignment sheet. I'm like "Wow." So Darrell wants me to help you to keep you from getting fired. He's like "that's what they are trying to do. They're trying to fire you."

[Deposition at 158].

This is merely a portion of the testimony offered by plaintiff with regard to the assignment sheet given to him by Lampkins, but it is sufficient to reveal the disingenuousness of defendant's characterization of it as a mere "to do" list. Moreover, while plaintiff was not, in fact, fired over failing to complete the assignment sheet (perhaps due to the aforementioned assistance from friends), it seems clear to this court that any reasonable employee would regard being given difficult-to-impossible tasks in order to manufacture a basis to fire him as a "materially adverse" employment action.

7

As quoted above, defendant concedes that this assignment sheet incident falls within the 180-day limitations period for plaintiff's retaliation claim, and this court therefore has little difficulty in concluding that the motion for summary judgment should be denied as to plaintiff's retaliation claim arising out of the assignment sheet episode. Moreover, while plaintiff will likely not be able to recover for the (quite plausible) acts of alleged retaliation which fall outside of the limitations period, it seems entirely proper that he be able to produce evidence at trial regarding those prior acts of alleged retaliation in order to demonstrate that, by giving him the assignment sheet, Lampkins was, in fact, intentionally committing an act of retaliation against him. This court therefore concludes that triable jury issues exist regarding plaintiff's Title VII retaliation claim, and defendant's motion to dismiss that claim will be denied.

This court now turns to Siemens' motion to dismiss the ADA claim against it, and, as to this claim, defendant concedes that a more forgiving period of limitations applies. This is because plaintiff raised ADA claims in the first charge of discrimination which he filed with the EEOC, and, that being the case, defendant argues that "Davis cannot use any alleged adverse action which occurred prior to August 11, 2022 or after February 17, 2023 to support his ADA claim." [Brief at 7]. However, even assuming that defendant's description of the applicable limitations period is accurate, this court disagrees with its contention that no evidence exists to support a claim arising during the actionable time period.

In so stating, this court notes that, within the meaning of the ADA, "discrimination" includes, among other things, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an

8

undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

In this vein, this court notes once again plaintiff's contention that, on August 18, 2022, the following exchange between himself and Lampkins took place:

> In my frustration and in tears, I asked him "why are you doing me like this?" I told him "you're trying to trigger my PTSD." He said "you know why." We began to talk loudly. Marlon Richards came and closed the door. HR diffused the situation and placed us both on a 30-day cooling-off period.

[Affidavit at 4-5]. This court believes that, considered in the light most favorable to Davis, this testimony essentially involves plaintiff informing Lampkins that he suffered from the disability of PTSD and asking that he be given the reasonable accommodation of not being singled out for negative treatment which triggers that condition. Of course, this request is most likely not properly regarded as an accommodation at all, but simply a request that he be treated with the minimum level of respect and dignity which any employee would expect. Moreover, this court believes that, considered in the light most favorable to plaintiff, a jury could interpret Lampkin's alleged "you know why" response as both a confession that he had, in fact, been trying to trigger plaintiff's PTSD and that he intended to continue doing so, plaintiff's request for an accommodation notwithstanding.

This court also notes that, in its brief, defendant argues that certain negative treatment which plaintiff alleges he received did not constitute an "adverse employment action" within the meaning of federal employment discrimination law, and it seeks dismissal of his ADA claim on this basis. Once again, however, the ADA's "reasonable accommodation" requirement constitutes an additional basis for liability under the Act, above and beyond its prohibition against subjecting an employee to an adverse employment action because of his disability. That aside, the ADA's anti-discrimination provision prohibits a wide range of conduct, providing that:

9

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C.A. § 12112.

The ADA thus prohibits disability discrimination with respect to, *inter alia*, "other terms, conditions, and privileges of employment," and, in its brief, defendant fails to acknowledge that the Fifth Circuit recently interpreted such language in a manner which is quite favorable to plaintiffs. Specifically, in *Hamilton v. Dallas Cnty.*, 79 F.4th 494, 496 (5th Cir. 2023), the *en banc* Fifth Circuit overruled prior circuit precedent which had held that only Title VII discrimination with regard to "ultimate employment decisions" was compensable. Instead, the Fifth Circuit in *Hamilton* adopted a much more lenient standard, pursuant to which a plaintiff need only show "that [he] was discriminated against, because of a protected characteristic, with respect to ... the 'terms, conditions, or privileges of employment'—just as the statute says." 79 F.4th at 506 (quoting 42 U.S.C. § 2000e-2(a)(1)).

This court notes that, while *Hamilton* was not a disability discrimination case, the relevant language of Title VII and the ADA in this context is virtually identical, and it thus seems highly likely that the Fifth Circuit would apply its holding in *Hamilton* to ADA cases as well. In its brief, defendant repeatedly relies upon pre-*Hamilton* Fifth Circuit precedent, and it is far from clear to this court that this precedent remains good law. Moreover, there are clearly at least some triable fact issues regarding whether plaintiff was discriminated against in this case, and, as such, this court concludes that it should wait until after the presentation of evidence of trial to decide exactly which provisions of the ADA might be implicated by the facts of this case. This approach will allow this court to not only consider the viability of plaintiff's ADA claims after having viewed the evidence at trial, but it will also allow both sides to frame their legal

10

arguments within the context of post-*Hamilton* Fifth Circuit law. With this understanding, defendant's motion to dismiss plaintiff's ADA claims will be denied.

This court notes that the parties have also filed a joint motion for trial continuance, noting scheduling conflicts involving counsel. Given that no prior motion for continuance has been filed in this case, and considering also that the parties agree that a continuance is in order, their joint motion will be granted.

It is therefore ordered that defendant's motion for summary judgment is denied, and the parties' joint motion for continuance is granted. The trial in this matter is hereby continued until a date to be determined later.

This, the 10th day of March, 2025.

    /s/ Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI